**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHLEEN HOGAN,** | ) | **CASE NO. 1:20 CV 1331** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| | ) | |
| **CITY OF PARMA, OHIO, et al.,** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendants, City of Parma and City of Parma Police Officer Peter Shepetiak ("Officer Shepetiak"). (Docket #37.)

## I. Factual and Procedural Background.[1]

On June 20, 2018, while working traffic enforcement in the City of Parma, Ohio, Officer Shepetiak stopped a car driven by Jonathan Legg. Prior to the traffic stop, Officer Shepetiak had randomly entered Mr. Legg's license plate number into his Mobile Data Terminal and discovered that the license plate on Mr. Legg's car was registered to a different vehicle.

---

1 The facts as stated in this Memorandum Opinion and Order are taken from the Parties' submissions. Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving Party.

(Deposition of Officer Peter Shepetiak ("Shepetiak Depo."), Docket # 37-1, at pp. 50-52.) As they were passing in opposite directions, Officer Shepetiak made eye contact with Mr. Legg. Officer Shepetiak testified that Mr. Legg "rapidly turned away" and "scooted down into his seat." (Id. at p. 53.) Officer Shepetiak then turned his car around; got behind Mr. Legg's car; activated his lights and sirens; and, Mr. Legg stopped after "quarter mile plus." (Id. at p. 55.) In a statement immediately following this incident, Officer Shepetiak indicated that Mr. Legg continued to drive for almost a half mile before stopping. (Id. at p. 81.)

After Mr. Legg had stopped, and either just prior to or right after Officer Shepetiak approached Mr. Legg, Detective Luke Berry of the neighboring City of Parma Heights Police Department arrived on the scene. Detective Berry was off-duty and his police radio was tuned to the City of Parma's police channel at the time of Officer Shepetiak's call for back-up, in which he indicated that the plates on the vehicle he was pursuing did not match the vehicle. (Deposition of Detective Luke Berry ("Berry Depo."), Docket #37-2 at pp. 33-34.) Detective Berry then saw Officer Shepetiak drive past him with his lights on, "chirping his siren." Detective Berry testified that it "didn't look like [Mr. Legg was] making any attempt to stop;" that he thought it might be a pursuit; that [Mr. Legg] "looked like he was deciding whether or not he was actually going to stop;" and, "then after chirping the siren a couple times, [Mr. Legg] eventually pulled over." (Id. at p. 34.) Detective Berry was "right there;" believed backup was several minutes away; and, stopped to assist Officer Shepetiak. Detective Berry testified that "due to what [he] had just seen and the elevated risk that – if the plates don't match the car, you don't know who the owner is, you don't know – it could be a stolen car, it could be a lot of things. So we – we always send two cars to that kind of a traffic stop until you figured it out." (Id. at p. 35.)

Detective Berry turned his car around; pulled up behind Officer Shepetiak; turned his lights on; and, walked up and waited near the front of Officer Shepetiak's police cruiser so as not to distract or surprise him. (Id.) Detective Berry was in plain clothes, wearing a shirt, tie and dress pants, with his badge on his right hip. (Id. at p. 36.)

Officer Shepetiak approached the passenger side of Mr. Legg's vehicle; introduced himself and explained the reason for the traffic stop; and, asked for Mr. Legg's driver's license and insurance. (Shepetiak Depo. at p. 58.) Officer Shepetiak testified that Mr. Legg explained that "the plates that were on his current vehicle belonged to another vehicle that was in a shop." (Id.) Officer Shepetiak testified that Mr. Legg appeared nervous – his hands were trembling, he was breathing heavily and sounded shaky – but that Mr. Legg was initially cooperative. (Id.) Officer Shepetiak then questioned Mr. Legg regarding whether he had anything illegal in the vehicle, including weapons. (Id. at p. 59.) Mr. Legg focused on the center console area and replied "no." (Id.) Officer Shepetiak stated that he made eye contact with Mr. Legg "at points," but that Mr. Legg "broke eye contact quite a bit." (Id. at 60.)

Detective Berry also spoke to Mr. Legg briefly through the passenger side window. Detective Berry testified that Mr. Legg was "rifling through papers" and "holding an e-check paper and talking about something with e-check." (Berry Depo. at p. 37.) Detective Berry thought that an issue with e-check requirements may have prevented Mr. Legg from renewing his license plates, thus explaining why he "put false plates on the car." (Id. at p. 38.) Detective Berry testified that Mr. Legg was uncontrollably shaking and so nervous that he couldn't hold his hands still. Detective Berry stated that Mr. Legg's voice was shaky but, other than that, Mr. Legg was coherent and sensible. (Id.) Detective Berry testified that Mr. Legg "largely avoided

eye contact" and that his focus was "primarily down into the center console." (Id. at p. 39.)

During that time, Officer Shepetiak had walked to the driver's side of the car; briefly looked at the car's VIN number; and, because he felt that Mr. Legg was "nervous beyond what a normal traffic stop" would cause, asked permission to search the vehicle. (Shepetiak Depo. at p. 62.) Detective Berry testified he believed a search was warranted given the extended time Mr. Legg took to pull over; the way Mr. Legg was fixated on the center console; the fact that the license plates did not match the car; and, because Mr. Legg was unusually nervous and could not control his nervousness. (Berry Depo. at pp. 40-41.) Mr. Legg agreed to the search and Officer Shepetiak asked Mr. Legg to step out of the vehicle. As Mr. Legg stepped out, Officer Shepetiak asked Mr. Legg to face the opposite direction and put his hands on the roof of the car so that he could conduct a pat down for weapons. (Shepetiak Depo. at p. 65.)

Detective Berry testified that up until that time, the traffic stop had been "very normal," until he saw Mr. Legg's "right hand shoot into the area of his waistband or right side, right hip side." (Berry Depo. at p. 45.) Detective Berry gave Mr. Legg a "verbal command for [Mr. Legg] to not – to show us his hands, because he started going down with his hands, and not to reach in his waistband." (Shepetiak Depo. at pp. 69-70.) Detective Berry testified that he gave multiple verbal commands to that effect. (Berry Depo. at p. 49.) Detective Berry stated that he does not remember ever yelling the word "gun." (Berry Depo. at p. 48-50.)

Officer Shepetiak did not have an opportunity to pat Mr. Legg down, nor did he see a gun, but his deposition testimony reflects that he believed Mr. Legg had a gun. (Shepetiak Depo. at pp. 74-78.) Officer Shepetiak testified that Mr. Legg's "hands dropped down in front of him," leading him to believe the gun was in his waistband. Officer Shepetiak immediately "grabbed

[Mr. Legg] . . . attempt[ing] to restrain him from grabbing his gun." (Id. at p. 73.) A witness to the incident, Jennifer Belcik, who was driving by at the time, stated via Affidavit that she saw Mr. Legg "start to wrestle with" Officer Shepetiak, who was "trying to hold on" to Mr. Legg. (Affidavit of Jennifer Belcik ("Belcik Affidavit"), Docket #37-3 at Paragraph 7.)

During that attempted restraint, Mr. Legg grabbed his gun and fired it numerous times, with one bullet hitting Detective Berry in the knee. (Shepetiak Depo. at p. 84.) Ms. Belcik stated that she witnessed Mr. Legg "pull out a gun and begin shooting" at Detective Berry and that Detective Berry then "grabbed his knee." (Belcik Affidavit at Paragraphs 8 and 9.) Detective Berry testified that he first realized Mr. Legg had a gun when he heard the first gunshot, but that the first gunshot did not hit him. (Berry Depo. at p. 47.) Officer Shepetiak testified, "It's all milliseconds of how it happened, sir. He grabbed his gun – or I was notified that there was a gun. His hands went down. I went to restrain him, and I don't even think I had a full, quote on, quote off, bear hug on him before he shot Detective Berry in the leg." Ms. Belcik stated in her Affidavit that after Officer Shepetiak separated from Mr. Legg "who was shooting, both Officers shot back" at Mr. Legg. (Belcik Affidavit at Paragraph 10.) Officer Shepetiak stated that he started shooting when he "told [himself] that [he] had to do something or [he was] going to die." (Shepetiak Depo. at p. 85.) Officer Shepetiak fired his gun 5 to 7 times, fatally injuring Mr. Legg. (Shepetiak Depo. at p. 86.)

## II. The Complaint.

On June 18, 2020, Kathleen Hogan, Mr. Legg's mother, as Administrator of Mr. Legg's Estate, filed this lawsuit against the City of Parma, the City of Parma Heights, Officer Shepetiak and Detective Berry, alleging that the policies and practices of the City of Parma and the City of

Parma Heights, along with a failure to properly train officers regarding interactions with individuals suffering from autism and/or other mental health disorders, ultimately caused the death of Mr. Legg, who was autistic. Ms. Hogan asserted a claim under 42 U.S.C. § 1983 for unreasonable search and seizure and use of excessive force (First Cause of Action); a claim for wrongful death under Ohio Rev. Code § 2125.02 (Second Cause of Action); and, a claim alleging Defendants "intentionally discriminated against Jonathan Legg or failed to provide him a reasonable accommodation when they used unnecessary and excessive force against him because of his disability," in violation of Title II of the Americans With Disabilities Act (Third Cause of Action.

On August 17, 2020, Defendants Luke Berry and the City of Parma Heights filed a Motion for Judgment on the Pleadings. (Docket #12.) On October 2, 2020, Defendants City of Parma and Officer Shepetiak filed a Motions for Judgment on the Pleadings. (Docket #20.) On December 18, 2020, this Court granted Defendants' Motions for Judgment on the Pleadings only as to Ms. Hogan's Americans with Disabilities Act Claim (Third Cause of Action). On April 2, 2021, the Court granted Ms. Hogan's unopposed Motion to Drop Certain Parties, dismissing Detective Berry and the City of Parma Heights from this case. (Docket #34.) Ms. Hogan's excessive use of force and wrongful death claims against Officer Shepetiak and the City of Parma remain.

## III. Motions for Summary Judgment.

On April 19, 2021, Officer Shepetiak and the City of Parma filed a Motion for Summary Judgment (Docket #37); Ms. Hogan filed a Memorandum in Opposition on May 19, 2021 (Docket #39); and, a Reply Brief was filed on May 28, 2021 (Docket #45). As set forth in the

briefing, Ms. Hogan's claims regarding excessive force relate to the actions taken by Officer Shepetiak to restrain Mr. Legg, which she claims were unnecessary, unwarranted and unnecessarily escalated the circumstances, resulting in the exchange of gunfire and Mr. Legg's wrongful death. Ms. Hogan argues that the City of Parma failed to adequately train its officers for encounters involving autistic citizens, and that the alleged lack of training resulted in the use of excessive force against her son.

## IV. Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist

unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## V. Discussion.

### A. First Cause of Action – Claims Brought Pursuant to 42 U.S.C. § 1983.

In order to prevail on a claim brought pursuant to § 1983, a plaintiff must establish by a preponderance of the evidence that a person acting under the color of law deprived him of a right secured by the United States Constitution or the laws of the United States. *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. Tenn. 2006). A violation of § 1983 must be intentional or knowingly committed in order to be compensable. A negligent or reckless deprivation is not sufficient. *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. Mich. 1999). Further, an injury caused by mere negligence, that does not rise to the level of a constitutionally protected interest, is not compensable under §1983. *See Collins v. City of Shaker Heights*, 503 U.S. 115 (1992).

Government officials are protected from liability for civil damages, including those that arise under §1983, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To determine

whether qualified immunity applies in a given case, we use a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. Ohio 2012); see also *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We can consider these steps in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, "If there is no constitutional violation, then plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity." *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. Mich. 2007)(citing *Scott v. Harris*, 127 S. Ct. 1769, 1779 (2007)).

**1. Excessive Force – Officer Shepetiak.**

Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard encompasses "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. Ohio 2002) (citing *Graham*, 490 U.S. at 396). It "allow[s] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The factors considered in assessing a constitutional excessive force claim include the particular facts and circumstances of each case, the severity of the crime, the threat posed by the suspect, and whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of the particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "An officer should be entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances with which he was faced." *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 175 (6th Cir. Mich. 2004) (citation omitted).

There was no use of force by Officer Shepetiak when he pulled Mr. Legg over; no use of force by Officer Shepetiak when he spoke to Mr. Legg regarding his license plate; no use of force by Officer Shepetiak when he asked Mr. Legg for permission to search the car; no use of force by Officer Shepetiak when he asked Mr. Legg to exit the vehicle; and, no use of force by Officer Shepetiak when he asked Mr. Legg to turn around and place his hands on the vehicle so that he could check Mr. Legg for weapons. Officer Shepetiak used force only upon being alerted by Detective Berry that Mr. Legg appeared to be reaching for something in his waistband and observing the same, and that use of force was objectively reasonable. Officer Shepetiak made a split-second judgment to "bear hug" Mr. Legg in an attempt prevent the situation from escalating. Officer Shepetiak's attempt to restrain Mr. Legg with a "bear hug" was reasonable and not excessive given the perceived threat, and ultimately not even enough force to prevent Mr. Legg from accessing the gun concealed in his waistband and shooting Detective Berry. Officer Shepetiak used no more force than necessary in his attempt to restrain Mr. Legg in response to his objectively reasonable belief that, at that moment, he needed to stop Mr. Legg from reaching for a weapon. There is no evidence from which a reasonable juror could find otherwise.

Further, given the fact that Mr. Legg was firing a gun at Officer Shepetiak and Detective Berry and shot Detective Berry, the Officers were reasonable in responding with deadly force, as

they most certainly had probable cause to believe that Mr. Legg posed an imminent threat of severe physical harm to themselves and others. The use of deadly force under the circumstances was not a violation of Mr. Legg's Fourth Amendment rights. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. Ohio 2005); *Burnette v. Gee*, 137 Fed. Appx 806, 810 (6th Cir. Ky. 2005).

Ms. Hogan argues that Officer Shepetiak "used excessive force and escalated the situation when he grabbed an autistic man from behind and attempted to throw him to the ground at a point in time when Jonathan was not under arrest; was not resisting; was not fleeing; and posed no immediate threat of harm to Defendant Shepetiak or anyone else." The undisputed facts demonstrate that this was a routine traffic stop – until the point when Officer Shepetiak and Detective Berry correctly identified the fact that Mr. Legg was reaching for something in his waistband. There was no use of force until that point. While both officers testified that Mr. Legg seemed quite nervous, there is no evidence that Officer Shepetiak or Detective Berry had any knowledge whatsoever that Mr. Legg may be autistic or mentally disabled, and their actions throughout the traffic stop, under the circumstances, were reasonable regardless. Mr. Legg suffered no Constitutional injury at the hands of Officer Shepetiak. Officer Shepetiak's "bear hug" was a reasonable use of force. Accordingly, Officer Shepetiak is entitled to summary judgment on Ms. Hogan's Section 1983 claim as a matter of law.

**2. Failure to Train – Defendant City of Parma.**

Ms. Hogan is also pursuing a Fourth Amendment claim against the City of Parma, arguing that the City of Parma failed to adequately train its police officers in dealing individuals who have autism or Asperger's Syndrome and that the City's policies and practices led to Mr. Legg's death.

"A municipality may not be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). When an action is brought under 42 U.S.C. § 1983 against a municipality, plaintiff must show that, due to its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. Ohio 2020) citing *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. Mich. 2013). This requires plaintiff to demonstrate that "the municipality had a 'policy or custom' that caused the violation of his rights." *Id.* at 880 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690). To state a cause of action, a plaintiff must demonstrate "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violation." *Id.*; *see Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. Ohio 2019). To properly plead a claim premised on inadequate training, the Supreme Court has held that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Regarding municipal liability under § 1983, the Supreme Court has held that if the officer inflicted no constitutional injury on a person, then it is "inconceivable" that the City could be liable to the person. *DeMerrell v. City of Cheboygan,* 206 Fed. Appx. 418, 429 (6th Cir. Mich. 2006) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(per curiam)). If "a person has suffered no constitutional injury at the hands of the individual police officer, the fact that department regulations might have authorized the use of constitutionally excessive force is quite

beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799.

As stated above, Mr. Legg suffered no constitutional injury at the hands of Officer Shepetiak. Accordingly, there is no basis upon which to find the City liable under Section 1983. Furthermore, Ms. Hogan asserted, without providing any supporting evidence, that the City of Parma failed to adequately train its police officers to deal with citizens who have autism or Asperger's syndrome. There is no evidence in the record, at all, regarding the training that the City of Parma does or does not provide to its police officers and, while Officer Shepetiak could not remember the specifics of his prior training regarding individuals with disabilities, that alone does nothing to establish that the City of Parma acted with a deliberate indifference to the rights of those with whom the police come into contact.[2] Accordingly, the City of Parma is entitled to summary judgment on Ms. Hogan's Section 1983 claim for failure to train as a matter of law.

**B. Second Cause of Action - Wrongful Death, Ohio Rev. Code § 2125.01.**

**1. Officer Shepetiak.**

Pursuant to Ohio Rev. Code § 2744.03(A)(6), employees of a political subdivision are immune from "a civil action brought . . . to recover damages for injury, death, or loss to persons

---

2

Officer Shepetiak testified during deposition that he believes he "had training how to deal with individuals with mental health disabilities," but was not certain whether the training specifically included discussion of autism. He testified he is not familiar with the mannerisms of a person with autism or Asperger's syndrome. (Shepetiak Depo. at p. 23-30.) Although Ms. Hogan alleges that the City did not provide adequate training and that autism-specific training would have been helpful in this situation, she offers no evidence in support of the same. Again, the Officers did not know that Mr. Legg was autistic and there is no evidence that had they known, they would have responded differently under the circumstances. Up until the Officers correctly perceived that Mr. Legg was reaching for a weapon, the entirety of the interaction between the Officers and Mr. Legg was calm and uneventful and Officer Shepetiak's "bear hug" restraint was objectively reasonable.

or property allegedly caused by any act or omission in connection with a governmental or proprietary function," unless the employee acted outside the scope of his employment, acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," or unless "liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6)(a)-(c). The provision of police services is a governmental function. Ohio Rev. Code § 2744.01(C)(2)(a).

"Malicious purpose encompasses exercising 'malice,' which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 136 Ohio App.3d 616, 620, 737 N.E.2d 563 (10th Dist. Ct. App. 2000) (citing *Jackson v. Butler Cty. Bd. of Cty. Comm'rs.*, 76 Ohio App.3d 448, 453-454, 602 N.E.2d 363 (12th Dist. Ct. App. 1991)). An act is committed recklessly if it is done "with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent." *Caruso*, 136 Ohio App. 3d at 621 (citing *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 771, 663 N.E.2d 384 (9th Dist. App. 1995)).

For the reasons outlined above, Officer Shepetiak's actions under the circumstances were reasonable and there is no evidence that his attempted restraint of Mr. Legg in response to a perceived threat, or the use of deadly force, both of which occurred within the scope of his employment, were the result of malice, or that Officer Shepetiak acted in bad faith or in a wanton or reckless manner. No reasonable juror could find otherwise. Accordingly, Officer Shepetiak is statutorily immune from Ms. Hogan's State law wrongful death claim and is entitled to summary judgment as a matter of law.

**2. The City of Parma.**

The provision of police services, including the training and supervision of police officers, is a governmental function and none of the exceptions to municipal statutory immunity apply. Ohio Rev. Code § 2744.02(A)(1); 2744.02(B); *McCloud v. Nimmer*, 72 Ohio App. 3d 533, 536-38 (Ohio Ct App. 8th Dist. 1991). Accordingly, the City of Parma is statutorily immune from Ms. Hogan's State law wrongful death claim and is entitled to summary judgment as a matter of law.

## VI. Conclusion.

The facts of this case profoundly illustrate the inherent danger police officers face when engaging in a traffic stop. Police officers must be observant, courteous, patient and vigilant – and, no matter how minor the offense, must never assume that a traffic stop will be "routine." In this case, what appeared to be a "routine" traffic stop, escalated into a fatal encounter when Mr. Legg reached for and grabbed his firearm and began shooting at the Officers, wounding Detective Berry and, as a result, suffered mortal wounds himself. The evidence presented in this case definitively demonstrates that Officer Shepetiak and Detective Berry acted reasonably and professionally throughout their encounter with Mr. Legg. The actions taken by both Officers to defend themselves and protect the public, in response to the immediate threat of danger on a public thoroughfare, were unquestionably proper, reasonable and necessary.

The Motion for Summary Judgment filed by Defendants, City of Parma and Officer Peter Shepetiak, (Docket #37) is hereby GRANTED.

This case is hereby TERMINATED.

IT IS SO ORDERED.

Donald C. Nugent

DONALD C. NUGENT
Senior United States District Judge

DATED: June 17, 2021